**Affirmed in Part and Reversed and Remanded in Part and Opinion filed August 30, 2018.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-17-00671-CV

---

**HOWARD F. LEDERER, Appellant/Cross-Appellee**

**V.**

**JAMES C. LEDERER, SUSAN LEDERER RUSSELL, KATHLEEN T. LEDERER AND MARJORIE E. LEDERER, Appellees/Cross-Appellants**

---

**On Appeal from the 270th District Court
Harris County, Texas
Trial Court Cause No. 2015-29219**

---

## O P I N I O N

In this dispute over the interpretation of a joint ownership agreement concerning real estate investment property, appellant contends that he is entitled to additional compensation in the form of a "15% override" for services rendered as coordinating agent based on the affirmative votes of the owners of a majority interest. Appellees, a small group of interest owners who voted against the 15%

override, contend that the joint ownership agreement does not provide for the compensation appellant seeks and that any modification to the agreement must be approved by unanimous consent. The trial court disposed of the issue on cross-motions for summary judgment and, after a bench trial on attorney's fees, rendered a final judgment in favor of appellees.

On appeal, appellant contends that the trial court erred in granting appellees' motion and denying his motion on the 15% override. Appellant also contends that the trial court erred in requiring him to reimburse attorney's fees and pay attorney's fees to appellees. Appellees have filed a cross-appeal complaining that the trial court erred in allowing appellant's expert to testify on attorney's fees and in failing to award appellees the full amount of their attorney fees. For the reasons explained below, we affirm in part and reverse in part and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    The Facts

In 1973, David Adickes, Steven Zax, Miles Glaser, Don Yarborough, and Don Evans entered in a Joint Ownership Agreement (JOA) for the purchase of real estate investment property in north Harris County (the Property). Adickes and Zax received undivided interests in the Property of 50% and 20% respectively, and the others received 10% undivided interests. At some point after that, Glaser and Evans sold their interests to Adickes.

Under the JOA, each owner was entitled to receive his proportionate share of the net income derived from the Property and was obligated to pay his proportionate share of the liabilities and obligations "arising from or incident to the ownership or operation of the Property." To secure each owner's obligation to perform under the JOA, the owners agreed to convey record title to the Property to a "Trustee"

empowered to, among other things, foreclose on the interest of a defaulting owner. The JOA also provided for a "Coordinating Agent" to manage the payment of expenses, liabilities, and obligations relating to the Property on behalf of the owners. Adickes was named the initial Coordinating Agent, and he also became Trustee of the Property.

In 1974, Adickes contributed his 50% ownership interest to the Tri-Bro Joint Venture in partnership with a company owned by investor A.C. Lederer. That same year, Zax contributed his 20% interest to the Zax Joint Venture in partnership with investor Paul A. Lederer. The joint venture agreements acknowledged that the undivided interests in the contributed property were subject to the JOA. The interests of all parties to this lawsuit flow from one or both of these joint ventures. The only remaining property interest not included in either joint venture was Don Yarborough's 10% interest.

George W. Lederer, the father of appellant Howard F. Lederer (Howard), was named Trustee on behalf of both the Tri-Bro Joint Venture and the Zax Joint Venture. The joint venture agreements also provided that the property contributed to them would be deeded to George W. Lederer as Trustee. According to Howard, he succeeded his father as Trustee and Coordinating Agent.

Over the years, ownership interests in the Property changed through sale, assignment, or inheritance. In 2005, Steven Zax filed a lawsuit to clarify his ownership interest under the JOA. The lawsuit was resolved by a 2006 "Settlement Agreement and Agreement to Clarify Interests" by and between Zax, a group of heirs and assigns, and others (Settlement Agreement). In 2006, a similar dispute about Adickes's then-existing ownership interests and his interest in the Tri-Bro Joint Venture was resolved in an "Agreement to Clarify Interests" by and between Adickes, various successors and assigns of A.C. Lederer's interest in the Tri-Bro

3

Joint Venture, and others (Agreement to Clarify).

Both the Settlement Agreement and the Agreement to Clarify recognized Howard as the successor Trustee under the JOA and directed that title to the subject property be deeded in Howard's name as Trustee.[1] Both agreements also recited that Howard, as Trustee, "shall be entitled to receive a fee (which is currently set at $200 per month) for serving as Trustee and Coordinating Agent under the [JOA]."

In early 2015, Howard sent the interest owners a letter informing them of upcoming property sales and distributions. In the letter, Howard detailed his efforts to preserve the ownership interests and provide a profitable return on the original investment in the Property.[2] He also stated that Adickes "thought that I should be rewarded for shepherding this deal for all." Specifically, Howard stated that Adickes approved of Howard's request for "a fifteen percent overriding share on all 2015, 2016 and future sales."

Howard included with the letter a voting form for the interest owners to approve or disapprove each of four property sales and the 15% override. Unlike the letter, the voting form was worded to request "a success sharing, revenue override of fifteen percent (15%) from all future distributions from our joint ownership venture for Howard Lederer" rather than a percentage of property sales.

---

[1] The Settlement Agreement reflects that the parties to that agreement: "agree, affirm and acknowledge that (a) Howard F. Lederer, Trustee is and shall by these presents be the record owner of the Property by virtue of his being the successor Trustee under that certain [JOA] originally executed in 1973 . . . and (b) Howard F. Lederer, Trustee is authorized and directed by the parties hereto to exercise his powers as Trustee under the [JOA] . . . ." The Agreement to Clarify contains an identical provision. The Agreement to Clarify also recites that Howard was appointed Trustee of the Tri-Bro Joint Venture in 1999 under a written instrument filed that same year in the Harris County Clerk's office.

[2] The Lederer Parties dispute Howard's contention that the Property's value has increased due to Howard's efforts. The Lederer Parties argue that the increase primarily resulted from the passage of forty years and the Property's proximity to The Woodlands and a new Exxon campus.

While over eighty-eight percent of the interest owners approved the 15% override, a group representing eight percent of the interest owners voted against it. Some of the disapproving interest owners indicated that although they agreed Howard should be compensated for his efforts, they felt that his request for a 15% overriding interest was "exorbitant" or "egregious." Some also argued that the JOA required all owners to approve the override.

## II.    The Lawsuit

In May 2015, interest owners James C. Lederer, Paul R. Lederer, John L. Lederer, Susan Lederer Russell, Kathleen T. Lederer, and Marjorie E. Lederer (the Lederer Parties), all of whom had voted against Howard receiving the 15% override, filed suit against Howard in a Harris County district court. Invoking the Texas Trust Code, the Lederer Parties asserted individual and derivative claims on behalf of all owners for breach of fiduciary duty and breach of contract, removal of Howard as Trustee, as well as actual and exemplary damages, an accounting, and attorney's fees. The Lederer Parties later added a request that the court enjoin Howard from, among other things, taking the 15% override.

After an unsuccessful mediation, the Lederer Parties filed two traditional summary judgment motions, one of which challenged whether Howard was entitled to the 15% override. Howard responded to both motions with a traditional and no-evidence motion for summary judgment and request for declaratory judgment on his entitlement to the 15% override. The trial court denied both parties' motions in July 2016.

In early 2017, the Lederer Parties filed a "Motion to Re-Urge the Parties' Cross-Motions for Summary Judgment on Defendant's 15% Override." In their motion, the Lederer Parties contended that Howard's entitlement to the 15% override was the "single controlling legal issue" in the case and that "[t]he determination of

this legal issue turns solely on the interpretation of an unambiguous contract." The Lederer Parties argued that the JOA: (1) provides for compensation to the Coordinating Agent in one limited circumstance that does not apply to Howard; (2) does not otherwise provide for compensation to the Coordinating Agent; and (3) cannot not be changed "except by written instrument signed by all Owners." Therefore, the Lederer Parties asserted, the JOA did not authorize the 15% override because Howard did not obtain the approval of all the interest owners.

In response to the Lederer Parties' motion to re-urge, Howard agreed that his entitlement to the 15% override was "an over-arching issue" and that the trial court "need only read the JOA and decide/interpret the rights of the parties." He also noted that the issue was the basis for his request for declaratory relief.[3] Beyond that, however, Howard disputed the Lederer Parties' interpretation of the JOA. Howard relied on another provision of the JOA authorizing the owners of the majority interest in the Property to decide "all matters relating to the . . . management . . . [and] operation of . . . the Property," which, he asserted, gave the majority "the power over compensation." Further, Howard argued, no one was voting to amend the JOA; they were simply voting to reward him for his management of the Property, so unanimous consent was not required.

On March 1, 2017, the trial court granted the Lederer Parties' motion to re-urge their traditional motion for summary judgment on Howard's 15% override and denied Howard's motion for summary judgment and declaratory judgment. The trial

---

[3] Howard's argument that that the documents provide for the owners of a majority interest to approve the 15% override appears in the traditional summary judgment section of Howard's motion. Howard also requested a declaratory judgment that "the Venture may pay [Howard] an amount approved by >88% of the owners for services rendered, notwithstanding his role as Coordinating Agent or the fact that he holds title to the real estate as Trustee." In the no-evidence portion of his motion, Howard asserted that the Lederer Parties had no evidence to support most of the elements of breach of contract and fiduciary duty.

court further declared that "[Howard] is not entitled to a 15% Override." The Lederer Parties then nonsuited their remaining claims, leaving only the issue of attorney's fees.

Howard filed a motion to clarify the declaratory judgment order. After considering the motion, response, evidence, and arguments of counsel, the trial court denied Howard's motion to clarify.

On May 1, 2017, the issue of attorney's fees was tried to the court. The attorneys for each side provided expert testimony. After the Lederer Parties' attorney testified and was cross-examined by Howard's attorney, the Lederer Parties moved to strike Howard's attorney from testifying as to Howard's fees or as a rebuttal witness, arguing that Texas Rule of Civil Procedure 193.6 precluded his testimony because Howard had failed to supplement discovery concerning his attorney's fees. The trial court denied the motion and allowed Howard's attorney to testify.

On May 24, 2017, the trial court signed a final judgment granting the Lederer Parties' summary judgment motion, denying Howard's motion, and declaring that Howard "is not entitled to a 15% Override." The trial court further ordered that Howard, "individually and not from the assets of the entity governed by the [JOA]" pay reasonable and necessary attorney's fees and expenses of $107,000.00 through judgment, plus court costs and post-judgment interest. In addition, Howard was to "reimburse the entity governed by the [JOA] for all attorney's fees, costs, and expenses that he has taken out of the entity governed by the [JOA] in the amount of $76,474.22, plus any attorney's fees, costs, and expenses removed since the day of trial, if any." Howard filed a motion to modify, vacate, correct, or reform the judgment, which the trial court denied.

Howard contends that the trial court erred by (1) finding that Howard was not entitled to be paid the 15% override; (2) requiring Howard to reimburse the entity governed by the JOA for his attorney's fees; and (3) awarding attorney's fees to the Lederer Parties when there was no finding of economic damages or a breach of any duty or contract, and the Lederer Parties had nonsuited or abandoned all affirmative claims prior to trial and failed to segregate their fees.

## I. The Trial Court's Finding that Howard was Not Entitled to the 15% Override

In his first issue, Howard contends that the trial court erred in finding that Howard was not entitled to be paid the 15% override when over 88% of the interest owners voted to approve the compensation and "the governing document provides that 'All matters relating to the sale, encumbrance, lease, management, development, ownership and operation of or other dealing with the Property shall be decided by the affirmative vote of the Owners of the majority interest in the property.'" The Lederer Parties have filed a brief in response to these arguments and, in addition, assert that Howard has waived his right to appeal the denial of the override.

We first address the Lederer Parties' waiver argument. Because we conclude that Howard did not waive his argument, we will proceed to set out the standard of review and applicable principles of contract interpretation followed by the application of the law to the facts.

### A. No Waiver

The Lederer Parties contend that Howard waived his right to appeal the denial of the override based on a proposed final judgment Howard submitted. Howard's proposed final judgment recited, among other things, that Howard's motion for declaratory relief was denied, the Lederer Parties' motion for summary judgment

8

was granted, and "Defendant is not entitled to a 15% Override." The proposed final judgment was signed by Howard's attorney as "Approved and Entry Requested." The Lederer Parties argue that Howard waived his issue because he "unqualifiedly requested" the trial court to enter a final judgment denying his entitlement to the 15% override, and the trial court ultimately entered a final judgment "as requested by Howard."

When a litigant moves the trial court to enter a judgment, and the trial court enters the judgment, the litigant cannot later complain of that judgment. *Casu v. Marathon Ref. Co.*, 896 S.W.2d 388, 389 (Tex. App.—Houston [1st Dist.] 1995, writ denied). To preserve the right to complain about a judgment on appeal, a movant for judgment should state in its motion to enter judgment that it agrees only with the form of the judgment and note its disagreement with the content and result of the judgment. *Id.* at 390 (citing *First Nat'l Bank of Beeville v. Fojtik*, 775 S.W.2d 632, 633 (Tex. 1989) (per curiam)); *see also Smith v. East*, 411 S.W.3d 519, 528–29 (Tex. App.—Austin 2013, pet. denied); *Bray v. Tejas Toyota, Inc.*, 363 S.W.3d 777, 787 (Tex. App.—Austin 2012, no pet.). However, "[w]hen a party merely provides a draft judgment to conform to what the court has indicated its judgment would be, there is no waiver of the appeal." *Ameripath, Inc. v. Hebert*, 447 S.W.3d 319, 328 (Tex. App.—Dallas 2014, pet. denied); *see also Glattley v. Air Starter Components, Inc.*, 332 S.W.3d 620, 636–37 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding that appellant did not waive issue when no motion to enter judgment was filed and proposed judgment was intended to conform to trial court's announced judgment, even though proposed judgment failed to note its disagreement as to contents).

In this case, Howard did not file a motion for entry of judgment. He submitted the proposed final judgment in connection with his briefing to the court on the

Lederer Parties' request for attorney's fees, and merely incorporated the trial court's prior ruling that he was not entitled to the 15% override. More importantly, the proposed final judgment Howard submitted concluded with the following ruling: "However, based upon the evidence presented at trial, the testimony of the witnesses, and the briefs of the parties[,] it is ORDERED, ADJUDGED AND DECREED that Plaintiffs take nothing." Howard's proposed judgment indicates his disagreement with the trial court's prior ruling, and his attorney's signature affirms Howard's request for entry of a take-nothing judgment against the Lederer Parties. Thus, contrary to the Lederer Parties' assertion, Howard did not "unqualifiedly" request that the trial court enter judgment that Howard is not entitled to the override. Nor did the trial court enter the take-nothing judgment "as Howard requested." We hold that Howard did not waive his appellate issue concerning the 15% override. *See Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 95–96 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

Having rejected the Lederer Parties' contention that Howard waived his right to appeal the denial of the 15% override, we turn to the substance of Howard's first issue.

**B.      Standard of Review and Applicable Law**

A trial court's ruling on a motion for summary judgment is reviewed de novo. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex. 2004). To prevail on a traditional motion for summary judgment, the movant must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). In reviewing the grant of a traditional summary judgment, we consider all the evidence in the light most favorable to the respondent, indulging all reasonable inferences in favor of the respondent, and determine whether the movant proved that there were no genuine issues of material fact and

10

that it was entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985). When competing summary judgment motions are filed, "each party bears the burden of establishing that it is entitled to judgment as a matter of law." *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 356 (Tex. 2000). If "the trial court grants one motion and denies the other, the reviewing court should determine all questions presented" and "render the judgment that the trial court should have rendered." *Id*.

Howard and the Lederer Parties rely on different provisions of the JOA to advance their arguments, but neither contends that the contract is ambiguous. A contract is not ambiguous merely because the parties disagree about its meaning and may be ambiguous even though the parties agree it is not. *URI, Inc. v. Kleburg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018). If a written contract is so worded that it can be given a definite or certain legal meaning when so considered and as applied to the matter in dispute, then it is not ambiguous. *Id*. at 765. A contract is ambiguous only if it is subject to more than one reasonable interpretation. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012). Both the presence of ambiguity and interpretation of an unambiguous contract are questions of law reviewed de novo using well-settled contract-construction principles. *URI*, 543 S.W.3d at 763.

In construing a contract, we must ascertain and give effect to the parties' intentions as expressed in the writing itself. *El Paso Field Servs.*, 389 S.W.3d at 805. To determine the parties' intent, we examine and consider the entire writing to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Id*.; *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 214 (Tex. 2011). We begin our analysis with the contract's express language. *El Paso Field Servs.*, 389 S.W.3d at 805–06. *Id*. We give terms their plain and

ordinary meaning unless the contract indicates that the parties intended a different meaning. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). No one phrase, sentence, or section of a contract should be isolated from its setting and considered apart from the other provisions. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994). To the extent of any conflict, specific provisions control over more general ones. *NuStar Energy, L.P. v. Diamond Offshore Co.*, 402 S.W.3d 461, 466 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *see Forbau*, 876 S.W.2d at 133–34.

### C.   Application of Law to Facts

Bearing in mind the above principles, we set out the provisions of the JOA on which the parties rely:

Section 1, Paragraph 5:

> Each of the undersigned parties shall be entitled to receive his aforesaid proportionate part of the net income derived from the Property and shall be entitled to his proportionate interest in all the benefits of ownership of said Property; each of the undersigned parties shall also be obligated to pay his proportionate part of the liabilities and bear his proportionate part of the obligations arising from or incident to ownership or operation of said Property, as more particularly hereinafter set forth.

Section 4:

> (a) All matters relating to the sale . . . encumbrance, lease, management, development, ownership and operation of or other dealing with the Property shall be decided by the affirmative vote of the Owners of the majority interest in the property, evidenced in writing. If the Owners of a majority interest should decide to take any action, then each other undersigned Owner (i.e., the Owners of the minority interest) shall be bound and obligated to execute and deliver such instruments and papers as may be necessary or reasonably proper to carry out and effectuate the decision of the owners of the majority interest. . . .

12

(b) David Adickes shall serve as "Coordinating Agent" with respect to said Property, and in such capacity shall have the right, on behalf of all owners, to incur ordinary and necessary expenses in reasonable amounts in connection with the handling and ownership of the Property; to make payments of expenses, liabilities and obligations relating to the Property (from funds belonging to the owners); [and] to give notice to owners when the owners should remit to the Coordinating Agent funds to be disbursed for payment of obligations, expenses or liabilities relating to the Property. . . .

Section 10:

The coordinating agent shall be authorized to list the property with a real estate broker, including himself if licensed, on a non-exclusive basis. The maximum commission payable under such listings shall be five percent (5%).

Section 11:

This agreement shall not be changed except by written instrument signed by all Owners. This instrument shall be binding upon and shall inure to the benefit of the Owners and their respective successors and assigns.

\* \* \*

### 1. Howard's Arguments

On appeal, Howard asserts that the parties' respective interests in the property made the basis of the suit "derive from a handful of governing documents," namely, the JOA, the Tri-Bro and Zax joint venture agreements, the Settlement Agreement, and the Agreement to Clarify. Based on these documents, Howard argues that he is entitled to the override, especially when "100% of the 'Owners' and over 88% of the interest holders agreed that [Howard] should be compensated for his work."

Turning to the JOA, Howard notes that it creates the separate positions of Trustee and Coordinating Agent and charges each with "separate and distinct tasks." Howard asserts that the Coordinating Agent "is charged with the day to day

13

operations" of the JOA based on Section 4(b) of the JOA. Howard also sets out the text of Section 4(a) and argues that that this section provides that the "major decisions" concerning the management and operations of the Property are left to the interest owners by majority vote, and the minority interest owners are obligated "to carry out and effectuate the decision of the owners of the majority interest." Howard does not discuss the Lederer Parties' contrary arguments or explain why their interpretation of the JOA is incorrect.

Howard next broadly argues that the JOA and the joint venture agreements are partnerships and, therefore, absent express provisions to the contrary, "the majority rules in a partnership." *See* Tex. Bus. Orgs. Code § 152.209(a) ("A difference arising in a matter in the ordinary course of the partnership business may be decided by a majority-in-interest of the partners.").[4] Alternatively, Howard contends that if the agreements are governed by trust law rather than partnership law, the Texas Trust Code provides that a trustee is entitled to reasonable compensation in any manner the beneficiaries choose. *See* Tex. Prop. Code §§ 114.001(a), 114.061(a).

But Howard does not direct us to any place in the record where he expressly presented these arguments to the trial court in response to the Lederer Parties' summary judgment motion, and we have not located them in either the summary judgment briefing on the 15% override or Howard's post-judgment motion.

_____

[4] According to Howard, the JOA was "created for the purpose of creating a partnership between the original Owners," citing *Rush v. First National Bank*, 160 S.W. 319, 323 (Tex. Civ. App.—Amarillo 1913) (noting that a partnership can be formed for "the buying of one tract or more of land at the same time and selling them for a profit"), *aff'd*, 210 S.W. 521 (Tex. Comm'n App. 1919, holding approved, judgm't adopted). Likewise, Howard notes that the Tri-Bro and Zax joint venture agreements expressly provide that "[t]his agreement and obligation hereunder shall be interpreted, construed and enforced in accordance with the laws of the State of Texas, specifically, the Texas Uniform Partnership Act."

Arguments not expressly presented in the summary judgment briefing are waived. *See* Tex. R. Civ. P. 166a(c); *Wells Fargo Bank, N.A. v. Murphy*, 458 S.W.3d 912, 916 (Tex. 2015). Even if the arguments were considered, Howard does not explain how these general partnership and trust principles inform the court's interpretation of the specific language of the JOA or overcome the Lederer Parties' contract-interpretation arguments. Parties asserting error on appeal must present some specific argument and analysis showing that the record and the law supports their contentions. *Pittman v. Campbell*, No. 14-14-00445-CV, 2016 WL 3435273, at *7 (Tex. App.—Houston [14th Dist.] June 21, 2016, no pet.) (mem. op.). We conclude that these arguments are inadequately briefed and thus waived. *See id.*

### 2. The Lederer Parties' Arguments

The Lederer Parties maintain, as they did in the trial court, that Section 10 of the JOA specifies the only compensation available for a Coordinating Agent. Section 10 provides that the Coordinating Agent "shall be authorized to list the property with a real estate broker, including himself if licensed, on a non-exclusive basis" for a maximum commission of five percent. It is undisputed that Howard is not a licensed real estate broker and so is not entitled to any fee under this provision. The thrust of the Lederer Parties' argument is that that Howard is not entitled to the 15% override because no other provision authorizes a fee to be paid to the Coordinating Agent and Howard did not obtain the approval of all the interest owners to modify the JOA to provide for additional compensation to the Coordinating Agent as Section 11 requires.

In response to Howard's reliance on Section 4(a), the Lederer Parties contend that Howard's argument ignores Section 10's specific provision defining the Coordinating Agent's compensation and assert that Howard is merely attempting to avoid the requirement of a unanimous vote to amend the JOA to pay himself the

override. The Lederer Parties argue that Howard's argument also falls short because Howard applies his 15% override to the interest owners' distributions rather than to property sales. According to the Lederer Parties, applying Howard's 15% override to the interest owners' distributions would mean that the interest owners would not receive their proportionate ownership interest in the net income and other benefits of ownership as contemplated in Section 1, and such a change in the owners' proportionate ownership interest would require the approval of all owners as Section 11 requires. Thus, the Lederer Parties argue, because Howard did not receive the unanimous approval of all the interest owners, he is not entitled to a 15% override on the interest owners' distributions.

### 3. Analysis

The sole provision of the JOA on which Howard relies is Section 4(a), which permits the owners of a majority interest to decide all matters relating to management and operation of the Property. Viewed in isolation, Section 4(a) reasonably could be construed as authorizing a majority to approve the 15% override to the Coordinating Agent for his specified duties relating to the general "operation and management" of the venture. However, we cannot view this provision in isolation, but must consider it context along with the other provisions of the JOA. *See Exxon Corp.*, 348 S.W.3d at 214–15; *Forbau*, 876 S.W.2d at 134.

As discussed above, Section 4(a) authorizes a majority to decide "[a]ll matters relating to the sale . . . , encumbrance, lease, management, development, ownership and operation of or other dealing with the Property." In contrast, Section 4(b) outlines the Coordinating Agent's duties to incur and pay expenses, liabilities, and obligations on behalf of the interest owners in connection with "the handling and ownership of the Property" and to collect funds from the interest owners to cover such payments. The purpose of dividing Section 4 into subsections (a) and (b)

16

appears to be to distinguish the majority interest owners' authority to decide important matters impacting the owners' investment in the Property from the Coordinating Agent's ministerial duties relating to the Property.[5]

Much later in the JOA, Section 10 authorizes the Coordinating Agent to undertake an additional activity—to list all or part of the Property with a licensed real estate broker. Section 10 also gives the Coordinating Agent an opportunity to earn a commission (capped at a maximum of 5%) by listing the property himself, if he is a licensed real estate broker. Section 10 contains the only provision that specifically permits the Coordinating Agent to receive some form of compensation for his efforts. Because the owners specified the only method for compensating the Coordinating Agent in Section 10, we cannot infer that the owners also intended to permit the majority interest owners to approve additional compensation to the Coordinating Agent in Section 4(a), particularly when Section 4(a) concerns decisions relating to "the Property" and nowhere does Section 4 mention compensation of any kind.

Had the original owners intended to authorize a majority to compensate the Coordinating Agent for the duties specified in Section 4(b), they could have done so in Section 4, but they did not. Because Section 10 is the only provision authorizing any form of compensation to the Coordinating Agent, we conclude that the original owners did not intend Section 4(a) to authorize the owners of a majority interest in the Property to approve additional compensation to the Coordinating Agent. This construction gives effect to both sections and harmonizes them. *See Exxon Corp.*,

---

[5] By comparison, Section 3 contains eight lengthy sections, not subdivided, addressing the steps to be taken if an owner defaults on his obligations under the JOA and the Trustee's duties in that event. Among other things, Section 3 provides that upon request, the Trustee shall sell all or part of the defaulting owner's interest and may take a commission of 5% out of the proceeds of the sale. In contrast, Section 4(b) describes the Coordinating Agent's duties but contains no provision for the Coordinating Agent to receive any type of compensation for his duties.

348 S.W.3d at 215.

Section 11 provides that any changes to the JOA require the unanimous consent of all interest owners. Howard did not get unanimous consent to amend either Section 4(a) or Section 10 of the JOA to authorize the interest owners to compensate him with a 15% override. Therefore, Howard was not entitled to the 15% override.

Even if the owners of a majority interest could approve some type of additional compensation for Howard, the compensation Howard requested would still require unanimous consent. The voting form Howard submitted to the interest owners requested that they vote to approve or disapprove "a success sharing, revenue override of fifteen percent (15%) from all future *distributions* from our joint ownership venture for Howard Lederer" (emphasis added). As Section 1 provides, the owners are entitled to receive their "proportionate part of the net income derived from the Property" and are entitled to "all the benefits of ownership of said Property." Howard's request for a share of all distributions, rather than a percentage of sales, would mean that the interest owners would receive less than their proportionate ownership interest in the net income. To change the proportionate ownership interest would require a change to the JOA, which in turn would require the unanimous approval of all interest owners as provided in Section 11.

Additional evidence confirms that Howard sought a percentage of the interest owners' total distributions rather than a percentage of sales. A letter from Howard to James Lederer concerning 2015 distributions showed that Howard calculated the amount of his override by subtracting his 15% from the combined total of the net proceeds from two land sales that year plus cash in the bank. If Howard's 15% were based on a percentage of sales, the gross sales proceeds would be reduced by that amount along with other transaction costs (such as real estate commissions and

18

closing costs) to determine the net sales proceeds without regard to the amount of cash in the bank.[6] But Howard added the net sales proceeds to the cash in the bank to determine the total cash available for distribution, and then subtracted his 15% from the amount that otherwise would have been available for distribution among the interest owners. Indeed, Howard acknowledges in his reply brief that the effect of the vote was that more than 88% of the interest holders "voted to approve a 15% override to [Howard] of their distributions as compensation." But Howard did not obtain unanimous consent to amend the JOA to permit him to obtain a portion of the interest owners' entitlement to receive their proportion part of the net income from the Property as provided in Section 1 of the JOA.

Consequently, the trial court did not err by granting the Lederer Parties' summary judgment motion, denying Howard's summary judgment motion, and declaring that Howard is not entitled to the 15% override.

### 4. Howard's Additional Arguments

Additionally, Howard suggests that he is entitled to the override because 100% of the original interest owners voted in favor of it. But nothing in the JOA gives special preference to the votes of the original owners who signed the JOA in 1973. To the contrary, Section 11 reflects that the original owners intended the JOA to be equally applicable to later interest owners: "This instrument shall be binding upon and shall inure to the benefit of the Owners and *their respective successors and assigns*" (emphasis added). For the same reason, we reject Howard's alternative argument, unsupported by any authorities, that we reform the trial court's judgment to prohibit Howard from receiving the 15% override only from those interest owners

---

[6] This would also be true whether the 15% override were treated as a commission, a cost, or an expense—the total net proceeds would be reduced by that amount rather than the total distributions.

who voted against it.

In his reply brief, Howard asserts for the first time that the Tri-Bro and Zax joint venture agreements, the Settlement Agreement, and the Agreement to Clarify reflect a "common understanding as shown through decades of common practice" among the parties that a majority of the JOA interest holders could grant overrides and determine the Coordinating Agent's compensation without unanimous consent.[7] Although the various agreements were discussed in both parties' summary judgment briefing and the documents were attached as evidence, Howard did not argue in the trial court that the documents evidenced a common understanding or practice over decades that raised a fact issue precluding summary judgment for the Lederer Parties. Indeed, Howard agreed that the JOA was the overarching document and relied almost exclusively on Section 4(a) to support his position that the owners of a majority interest could vote to approve the 15% override Howard sought. We do not consider this argument, not only because it was not made in the trial court, *see Wells Fargo Bank*, 458 S.W.3d at 916, but also because it is a new issue raised for the first time in a reply brief. *See DEK-M Nationwide, LTD v. Hill*, No. 14-15-01030-CV, 2017 WL 1450016, at *3 n.4 (Tex. App.—Houston [14th Dist.] Apr. 18, 2017, pet. denied) (mem. op.).

Lastly, Howard contends in his reply brief that the trial court's ruling was improper because it did not include either of the parties' requested declarations and "wholly fails to provide certainty to the parties' future dealings as declaratory relief

---

[7] Specifically, Howard asserts that the Tri-Bro and Zax joint venture agreements changed the owners' respective percentages of ownership and inserted payment overrides without unanimous approval; the Settlement Agreement and the Agreement to Clarify contained payout overrides that were not unanimously approved; and the Settlement Agreement and Agreement to Clarify also provided for compensation to Howard as Coordinating Agent and Trustee. These documents merely reflect agreements between the parties to those agreements concerning their respective interests, but none of them purport to change the JOA in any way.

20

cases require." Howard also complains that the trial court denied his motion to clarify. Because Howard raises these new issues for the first time in his reply brief, we do not consider them. *See id*.

In sum, we hold that the trial court did not err by resolving the parties' cross-motions for summary judgment in favor of the Lederer Parties and concluding that Howard is not entitled to a 15% override. We overrule Howard's first issue.

## II. Requiring Howard to Reimburse the Entity Governed by the JOA for Attorney's Fees

In his second issue, Howard contends that the trial court erred by requiring him to reimburse the entity governed by the JOA for $76,474.22 in attorney's fees, costs, and expenses. The trial court did not specify the basis for its fee award. Howard primarily relies on the Trust Code to argue that as Trustee of the JOA, he cannot be forced to reimburse his attorney's fees when the trial court made no finding of damages or breach of any duty. The Lederer Parties respond that the trial court properly ordered reimbursement under either the Trust Code or the Uniform Declaratory Judgment Act (the Act). We conclude that the trial court awarded the Lederer Parties' attorney's fees under the Act, and that the Act authorizes the trial court to require Howard to reimburse his attorney's fees taken out of the entity governed by the JOA.

Under the Act, a person whose rights, status, or other legal relations are affected by a written contract, or other writings constituting a contract, may have determined any question of construction or validity arising under the contract and "obtain a declaration of rights, status, or other legal relations thereunder." *See* Tex. Civ. Prac. & Rem. Code § 37.004(a). A declaration may be either affirmative or negative in form and effect, and the declaration has the force and effect of a final judgment or decree. *Id*. § 37.003(b).

21

In a declaratory judgment proceeding, the court "may award costs and reasonable and necessary attorneys' fees as are equitable and just." *Id*. § 37.009; *Wells Fargo Bank*, 458 S.W.3d at 919.[8] The Act "entrusts attorney fee awards to the trial court's sound discretion, subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law." *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). These statutory limitations are complimented by other limiting principles, such as segregation of fees. *Wells Fargo Bank*, 458 S.W.3d at 919.

In response to the Lederer Parties' suit, Howard filed a counterclaim requesting declaratory relief and attorney's fees under the Act. Howard specifically sought a declaration that he was entitled to the 15% override based on the vote of over 88% of the interest owners. The Lederer Parties answered as counter-defendants and requested attorney's fees incurred in responding to Howard's counterclaim for declaratory judgment pursuant the Act. The parties' pleadings thus sufficiently characterized their claims relating to the 15% override as being within the purview of the Act. *See Wells Fargo Bank*, 458 S.W.3d at 916 ("Because the Murphys pleaded for declaratory relief and Wells Fargo pleaded for the recovery of its attorney's fees for either prosecuting or defending a claim for declaratory relief, the trial court was authorized to enter a judgment awarding Wells Fargo its attorney's fees under the [Act]."). The trial court resolved the discrete legal issue presented in the parties' cross-motions for summary judgment and declared that Howard "is not

_____

[8] Similarly, section 114.064 of the Trust Code provides: "In any proceeding under this code the court may make such award of costs and reasonable and necessary attorney's fees as may seem equitable and just." Tex. Prop. Code § 114.064; *Hachar v. Hachar*, 13 S.W.3d 138, 142 (Tex. App.—San Antonio 2004, no pet.) (describing the attorney's fees provision of the Trust Code and section 37.009 of the Act as "virtually identical" and stating that neither makes an award of attorney's fees dependent on a finding that a party "substantially prevailed." *Id*.

entitled to a 15% override." The court further awarded the Lederer Parties reasonable and necessary attorney's fees in an amount that was also "equitable and just," consistent with the Act.

The Lederer Parties argue that Howard personally benefitted by paying his attorney's fees from the entity governed by the JOA for a declaration that would mean more money for him and less for all the interest owners,[9] and therefore the trial court acted within its discretion to conclude that it was not equitable and just to allow the entity governed by the JOA to bear the cost of Howard's defense. Howard does not contend that the Act does not authorize the trial court to order reimbursement or contend that the reimbursement order is inequitable or unjust.[10] Under the circumstances of this case, we cannot say that the trial court abused its discretion in requiring Howard to reimburse the entity governing the JOA for his attorney's fees. *See* Tex. Civ. Prac. & Rem. Code § 37.009; *Save Our Springs Alliance, Inc. v. Lazy Nine Mun. Utility Dist.*, 198 S.W.3d 300, 318–19 (Tex. App.—Texarkana 2006, pet. denied). We overrule Howard's second issue.

## III. Award of Attorney's Fees to the Lederer Parties

In his third issue, Howard contends that the trial court erred by awarding attorney's fees to the Lederer Parties when there was no finding of economic

---

[9] At the trial, the Lederer Parties' attorney testified that their lawsuit saved all the owners between $1.5 and $2 million.

[10] In his reply brief, Howard argues that the judgment is vague and unenforceable because there is no "entity governed by the Joint Ownership Agreement." We do not consider this argument because the record does not reflect that Howard raised this complaint in the trial court at a time when the court could have made any necessary clarification, *see* Tex. R. App. P. 33.1(a), and because Howard raises this complaint for the first time in his reply brief. *See DEK-M Nationwide*, 2017 WL 1450016, at *3 n.4. In any event, we note that the record shows that Howard sought to modify the trial court's judgment based on a purported settlement agreement with certain interest owners, which confirms that Howard was paid $76,474.22 in legal fees from the "Joint Ownership Account." Howard does not deny that he took the money from this account or claim that he does not know where to return it.

damages or a breach of any duty or contract, and the Lederer Parties dismissed or abandoned all affirmative claims prior to trial. Howard also argues that the Lederer Parties are not entitled to an award of attorney's fees because they "failed and refused" to segregate their fees.

## A. Basis for Attorney's Fees Award

Howard first argues that the only claims the Lederer Parties pleaded that support an award of attorney's fees were breach of contract and violations of the Trust Code, but the Lederer Parties nonsuited or abandoned those claims before trial, except for their claim for attorney's fees. Howard also argues that the Lederer Parties cannot recover attorney's fees under the Act because they have not filed any independent affirmative pleading seeking declaratory relief and may not use the Act "to recover fees that were not otherwise available." *See, e.g.*, *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 669 (Tex. 2009) ("[T]he rule is that a party cannot use the Act as a vehicle to obtain otherwise impermissible attorney's fees.").

Howard's premise ignores the fact that he is the party who expressly sought declaratory relief, and in response, the Lederer Parties answered and counterclaimed for attorney's fees under the Act for having to respond to Howard's declaratory judgment claim. Although the Lederer Parties nonsuited all their remaining claims before trial, their request in their counterclaim for attorney's fees under the Act remained. "[A]ttorney's fees may be awarded under this Act to a party who presented no claims, and even where the declaratory judgment sought concerns a question of law on which no jury finding is necessary." *U.S. Fid. & Guar. Co. v. Coastal Ref. & Mktg., Inc.*, 369 S.W.3d 559, 571 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *accord Save Our Springs Alliance*, 198 S.W.3d at 318 ("Either party may obtain attorney's fees [under the Act] regardless of which party is affirmatively

24

seeking relief."). "One need not even be the prevailing party or seek affirmative relief to be awarded attorney's fees under the [Act], as long as the award of fees is equitable and just." *Hong Kong Dev., Inc. v. Nguyen*, 229 S.W.3d 415, 452 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

Given that both parties pleaded for attorney's fees under the Act and that the declaratory relief Howard requested was resolved by summary judgment in favor of the Lederer Parties, the trial court did not abuse its discretion by awarding attorney's fees to the Lederer Parties under the Act.

## B.     Segregation of Fees

Lastly, Howard contends that the trial court erred by awarding the Lederer Parties attorney's fees when they failed and refused to segregate their fees. The Lederer Parties counter that Howard waived any complaint about the failure the segregate fees. Alternatively, the Lederer Parties argue that attorney's fees were recoverable for all their claims (under the Trust Code, the Act, and breach of contract), but even if some were not, segregation was not required because all the claims were inextricably intertwined.

### 1. No Waiver

The Lederer Parties first argue that although Howard questioned the Lederer Parties' expert about whether he had segregated fees, Howard waived his appellate complaint because he did not object to the expert's testimony or the admission of the firm's fee statements. Here, however, Howard not only elicited testimony from the Lederer Parties' expert that the expert made no effort to segregate fees because "the work" was "inextricably intertwined," Howard also mentioned segregation during closing argument and informed the trial court that he would be submitting a trial brief on the issue. Prior to the trial court's rendition of judgment, Howard filed his

brief, in which he objected to the Lederer Parties' failure to segregate their fees.[11] The nature of Howard's cross-examination and his attorney's comments also reflect that the trial court understood that Howard was challenging the Lederer Parties' failure to segregate their fees. On this record, we hold that Howard did not waive the issue. *See Home Comfortable Supplies, Inc. v. Cooper*, 544 S.W.2d 899, 909–10 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (holding that fee segregation issue was not waived when raised before the issue was submitted to the fact finder and the record showed that trial court was aware of the nature of the complaint).

## 2. Segregation of Attorney's Fees Required

Attorney's fees are recoverable only when provided for by statute or the parties' contract. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006). Generally, "a claimant must segregate legal fees accrued for those claims for which attorneys fees are recoverable from those that are not." *Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (Tex. 2017) (citing *Chapa*, 212 S.W.3d at 314). "An exception exists only when the fees are based on claims arising out of the same transaction that are so intertwined and inseparable as to make segregation impossible." *Id*. But, intertwined facts alone do not make fees for unrecoverable claims recoverable; "it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Chapa*, 212 S.W.3d at 313–14. Nor are unrecoverable legal fees rendered recoverable merely because they are nominal. *Id*. at 313. The party seeking to recover attorney's fees bears the burden of demonstrating segregation is not required. *CA Partners v. Spears*, 274 S.W.3d 51, 82 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

---

[11] We note that the trial court requested that the Lederer Parties provide post-trial briefing on the issue of the court's authority to direct Howard to return the legal fees he took from the entity governed by the JOA for his defense shortly before Howard indicated his intention to provide briefing on the segregation issue. Both parties subsequently submitted briefs prior to judgment.

Attorneys are not required to keep separate records documenting the exact amount of time working on one recoverable claim versus an unrecoverable claim. *Alief Indep. Sch. Dist. v. Perry*, 440 S.W.3d 228, 246 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). Segregation is sufficiently established if, for example, an attorney testifies that a given percentage of the drafting time would have been necessary even if the claim for which attorney's fees are unrecoverable had not been asserted. *Id.* In *Perry*, this court held that the evidence supported a conclusion that the appellee properly and adequately segregated attorney's fees under the *Chapa* standard when he reduced his reasonable and necessary fees by specific percentages as to parties and claims for which fees were not recoverable and presented evidence of how he segregated fees by claim and party. *See id.* at 246–47. Likewise, in *State Farm Lloyds v. Hanson*, this court held that the appellee sufficiently segregated attorney's fees when the appellee's attorney testified that discovery for the appellee's contract claim equally applied to his bad faith claims, approximately 95% of the attorney's work went toward or was intertwined with getting the appellee a new roof pursuant to the contract and 5% was spent solely on bad faith issues, and the attorney's testimony was supported by evidence. *See* 500 S.W.3d 84, 102–05 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Howard emphasizes that the Lederer Parties nonsuited or abandoned all the claims on which their suit was based, and therefore it was incumbent on them to segregate fees expended on claims for which fees may not be recovered and claims for which they no longer sought affirmative relief. Howard also argues that under *Chapa*, the mere existence of common facts and circumstances across the Lederer Parties' numerous causes of action is insufficient to support their contention that segregation was unnecessary because their claims were intertwined.

At the trial on attorney's fees, the Lederer Parties' expert was one of the

attorneys of the firm representing the Lederer Parties. The expert testified that the firm was asking for $300,000.00 (after discounting fees totaling $425,000.00) as reasonable and necessary fees. The firm's billing statements also were admitted into evidence.

The expert stated that all the Lederer Parties' claims involved Howard's attempt to get a 15% override on every disbursement to the interest owners. According to the expert, his firm's efforts eliminated the override and saved the interest owners between $1.5 million and $2 million in future charges when the trial court ruled on the partial summary judgment in the Lederer Parties' favor. As a result, the expert stated, the Lederer Parties were willing to "pull down" their remaining claims and try only the attorney's fees because all of the claims were geared to "bust[ing]" the 15% override. The expert explained that once they prevailed on the issue of the 15% override, the Lederer Parties' trust and contract claims on that issue were resolved; moreover, Howard's subsequent removal as trustee mooted the removal action. Consequently, only two issues remained: whether Howard breached a duty or the JOA by (1) paying a 6% commission to real estate brokers (in excess of the 5% commission allowed in Section 10 of the JOA), and (2) taking a $200.00 per month commission for too many months. The expert testified that after concluding that the cost of trying those two claims would exceed their value, it was decided that these claims would be abandoned.

On the issue of fee segregation, the Lederer Parties' expert opined that because all of the claims were directed to defeating Howard's attempt to take the 15% override, all of the firm's work was "inextricably intertwined." During cross-examination, the expert acknowledged that in addition to the summary judgment on the override, the Lederer Parties had filed another partial summary judgment on the excessive-commission issue. The expert disagreed that work on the summary

judgment motions could be separated, however, because "everything was so intertwined."[12] Howard's attorney then cross-examined the expert on his firm's billing for other issues that Howard suggested were unrelated to the summary judgment on the 15% override. The Lederer Parties' expert nevertheless maintained that, other than the two issues that were dropped, everything relating to the 15% override was intertwined. The expert admitted, however, that he made no attempt to segregate out any fees for work relating to the 15% override issue.

Because the Lederer Parties voluntarily dismissed or abandoned all of their affirmative claims after prevailing on the 15% override, they could only recover attorney's fees for their defense of Howard's declaratory judgment action on the 15% override. *See Kinsel*, 526 S.W.3d at 427; *Chapa*, 212 S.W.3d at 313–14; *see also NP Anderson Cotton Exchange, L.P. v. Potter*, 230 S.W.3d 457, 467 (Tex. App.—Fort Worth 2007, no pet.) ("When a party pleads several causes of action including a request for a declaratory judgment and an award of attorney fees and is subsequently awarded declaratory relief but denied other relief, the party is entitled only to those attorney fees attributable to the declaratory judgment action."); *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 143 (Tex. App.—El Paso 1997, pet. denied) (holding party who did not recover on breach of contract and real estate fraud claims was entitled to attorney's fees only on declaratory judgment action). Consequently, the Lederer Parties were required to segregate attorney's fees incurred for legal services related to recoverable and non-recoverable claims. *See Kinsel*, 526 S.W.3d at 427.

The Lederer Parties' expert did not offer any testimony that all the legal services that advanced the unrecoverable claims also advanced the recoverable

---

[12] At this point, Howard's counsel "kind of agree[d] that it was intertwined" but pointed out that it was the Lederer Parties' burden to segregate fees.

defense of Howard's declaratory judgment action. *See Tijerina v. Wysong*, No. 14-15-00188-CV, 2017 WL 506779, at *9 (Tex. App.—Houston [14th Dist.] Feb. 7, 2017, no pet.) (mem. op.). Nor does the record support the Lederer Parties' argument that segregation was not required because all the claims were "inextricably intertwined." To the contrary, the Lederer Parties' expert acknowledged that at least two of the claims were unrelated to the 15% override issue, and another claim became moot during the pendency of the case. Although the expert opined that the unrelated claims were not worth pursuing, unrecoverable fees are not rendered recoverable simply because they are nominal. *Id*. (citing *Chapa*, 212 S.W.3d at 313–14). We see no reason why the expert could not have opined on the reasonable percentage of fees attributable solely to the Lederer Parties' unrecoverable claims, even if it was a nominal amount. *See Chapa*, 212 S.W.3d at 313–14; *Hanson*, 500 S.W.3d at 105; *Perry*, 440 S.W.3d at 247.

The trial court did not specify the basis for its award of attorney's fees to the Lederer Parties, which was less than the amount requested. Absent testimony concerning what portion of attorney time was allotted for work incurred in the successful defense of Howard's declaratory judgment claim and what portion was allotted for work incurred solely to advance claims for which attorney's fees were unrecoverable, we must remand the case for a new trial on the attorney's fees issue. *See Kinsel*, 526 S.W.3d at 428; *Chapa*, 212 S.W.3d at 314. We sustain Howard's third issue in part.

## THE LEDERER PARTIES' CROSS-APPEAL

On cross-appeal, the Lederer Parties contend that the trial court erred in allowing Howard's attorney to testify as an expert on attorney's fees over their objection and in failing to award the Lederer Parties the full amount of their fees. We need not reach these issues due to our disposition of Howard's issues. *See* Tex. R. App. P. 47.1.

## CONCLUSION

We reverse the portion of the trial court's judgment awarding attorney's fees to appellees, sever that portion of the judgment, and remand the issue to the trial court for a new trial on the issue of the Lederer Parties' attorney's fees. We do not reach the Lederer Parties' cross-appeal. We affirm the remainder of the trial court's judgment.


/s/     Ken Wise
        Justice


Panel consists of Justices Boyce, Donovan, and Wise.