**Opinion issued February 28, 2023**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-21-00085-CV

———————————

**BAY AREA RV PARKS, L.L.C. AND CHARLES E. SIMMONS,**
**Appellants/Cross-Appellees**

**V.**

**WGB RV PARKS, LLC, JUDSTON F. WELLING, AND JONATHAN D.**
**GIBBS, Appellees/Cross-Appellants**

———————————

**On Appeal from the 113th District Court**
**Harris County, Texas**
**Trial Court Case No. 2019-32654A**

———————————

## MEMORANDUM OPINION

This case involves a dispute between business partners. Bay Area RV Parks,

L.L.C. ("Bay Area"), Judston F. Welling, and Jonathan D. Gibbs are all members of

WGB RV Parks, LLC ("WGB"). After WGB sold two properties in 2019, Bay Area demanded that a portion of the proceeds be used to return its initial capital contribution. Welling and Gibbs disagreed that Bay Area was entitled to this payment. Bay Area, its principal Charles E. "Chuck" Simmons, Welling, and Gibbs all filed claims for declaratory relief, seeking declarations concerning the interpretation of the company agreement and whether Bay Area was entitled to a preferential return of its capital contribution. After a bench trial, the trial court found that Welling and Gibbs failed to satisfy the terms of a provision in the company agreement, and it awarded Bay Area $204,000 in attorney's fees from Welling and Gibbs. The trial court did not rule that Bay Area was entitled to the return of its capital contribution.

In four issues,[1] Welling and Gibbs argue that (1) they are entitled to judgment as a matter of law that Bay Area should not recover its capital contribution based on the unambiguous distribution provisions in the company agreement; (2) the evidence does not support the trial court's conclusion that Welling and Gibbs failed to satisfy a provision in the company agreement; (3) the trial court erred by awarding

---

[1]     Bay Area and Simmons also filed a notice of appeal. In their cross-appeal, Bay Area and Simmons argued that the trial court erred by conditioning the return of Bay Area's capital contribution on a super-majority vote of WGB's members and refusing to award Bay Area its capital contribution. While this appeal was pending, Bay Area informed this Court that the parties had reached a settlement on the issue asserted in Bay Area's cross-appeal. We therefore do not consider this issue in this opinion.

2

attorney's fees to Bay Area; and (4) the trial court should have awarded attorney's fees to Welling and Gibbs.

We reverse and render judgment in part and remand in part.

**Background**

*A.*      *Adoption of the Amended Company Agreement*

WGB RV Parks, LLC formed in 2009 and had three initial members: Judston "Judd" Welling, Jonathan Gibbs, and Heights Equity Funding Corp.[2] Michael Bell was the principal for Heights Equity Funding. WGB owned and operated three recreational vehicle parks in the greater Houston area: Lazy Days, Little Thicket, and Park on the Lake.

In 2017, the members of WGB planned to improve and expand the properties, and one of the properties had maintenance concerns. To address these issues, the members agreed to admit a new member: Bay Area RV Parks, LLC. Bay Area made a $500,000 initial capital contribution to WGB.

According to Bell, the existing members of WGB wanted Bay Area to contribute $750,000 to WGB, but Simmons negotiated Bay Area's initial capital contribution down to $500,000. During these discussions, Simmons took the position that "he wanted his 500,000 back as a preferential return of his capital before

---

[2]      Community RV Investments, LLC is the successor in interest to Heights Equity Funding. Michael Bell is the principal of Community RV. Bell and Community RV are parties to the underlying proceeding, but they are not parties to this appeal.

3

profits were distributed." The members of WGB agreed to this. When Bell approached an attorney to draft an amended company agreement, he asked the attorney "to prepare a clause to the contract that would cover a distribution on a sale that included a preferential return of Mr. Simmons' 500,000."

Upon agreeing to admit Bay Area as a member of WGB, the members, including Bay Area, executed an "Amended and Restated Company Agreement of WGB RV Parks, LLC" ("the Agreement"). All members agreed to and signed the Agreement.

Article 5 of the Agreement governs "Distributions and Allocations." Section 5.1, entitled "Distributions," provides that "Distributable Cash Flow shall be distributed to the Members at such time and in such amounts as a Super Majority Interest shall determine in accordance with the Interest Allocations." Section 5.2, entitled "Profits, Losses and Distributive Shares of Tax Items," explains, among other things, how profits and losses for each fiscal year are to be allocated to the members. Section 5.2(a)(1) states, "Except as provided in Section 5.2(c) [which sets out two "special allocations"], Profits for any Fiscal Year will be allocated to the Members as follows: . . . [f]irst, to reduce a Member's positive Capital Account

4

balance to zero."[3] Section 5.2(a) then states four additional levels of allocation of profits.

Section 5.2(f)(1) states, "Except as otherwise provided in this Agreement, all Profits, Losses and other items allocated to the Members will be allocated among them in proportion to their respective Interest Allocations." Section 5.3 contains a mechanism allowing members to receive cash distributions "in an amount sufficient to enable such Member to discharge its cumulative U.S. federal tax liability (excluding interest and penalties) arising as a result of such Member's interest in the Company . . . ." Distributions made under this provision must be debited against the member's capital account "and shall be treated as an advance distribution that will reduce on a dollar-for-dollar basis the amount of later distributions" to the member. Section 5.7, entitled "Allocation Upon Sale of Property" provides, "Notwithstanding anything to the contrary in this Agreement, upon the sale of the Property to an independent third party, the Profits of such sale of the Property shall be allocated first to return the unreturned Capital Contribution of a Member and then pursuant to Section 5.2."

---

[3]      Bell agreed that he told Welling and Gibbs that this provision was added to the Agreement "to satisfy Mr. Simmons' request that he be given a preferential return of his capital account before profits were distributed if there was a sale." Welling and Gibbs agreed to the provision. Bell also testified that, during the process of drafting the Agreement, neither Welling nor Gibbs ever stated that they did not agree that Simmons would receive his capital contribution "back first" upon the sale of a property.

The Agreement also contains a distribution provision in Section 8.2, which applies upon the winding up of WGB. Under this provision, the liquidator of the company must pay all company debts and liabilities and then sell all properties and assets of the company for cash. "All Net Profit and Net Loss realized on such sales shall be allocated to the Members as provided in this Agreement, and the Capital Accounts of the Members shall be adjusted accordingly." The liquidator must then "distribute the proceeds of such sales or such properties to the Members in the manner provided in Section 5.1." At the time of trial, WGB was still in existence and had not been wound up.

## B. *Sale of WGB Properties*

The three properties owned by WGB were all encumbered by a lien held by Moody National Bank. The outstanding balance on this loan was approximately $4,000,000. In 2018, after deciding not to make improvements to two of the properties—the Lazy Days and Little Thicket RV parks—the members began discussing whether to place the properties on the market. During these discussions, Bell proposed making cash distributions to each member upon sale of the properties, and he proposed distributing nearly $1,200,000 to Bay Area and nearly $700,000 to the other partners. Simmons responded favorably to this plan, but Gibbs responded by stating, "I don't recall ever executing a contract that provides you with ownership, plus a guarantee of your total investment in the business and all of the upside of a

sale." Gibbs and Welling did not agree that Bay Area should receive an additional $500,000 out of the proceeds from a sale of the properties.

In 2019, all four members of WGB agreed to sell Lazy Days and Little Thicket to a third party. The purchase price for these two properties was $2,750,000, and WGB realized a profit from these sales. The net proceeds from the sales—approximately $2,500,000—were used to reduce the balance of WGB's loan with Moody National Bank. After Moody National Bank received the proceeds, the balance of the loan was approximately $1,500,000. Gibbs testified that all members of WGB agreed that the proceeds of these sales would be used to reduce this indebtedness and no payments would be made to members.

WGB did not use any of the profits from these sales to return Bay Area's capital contribution. After the sale of the properties closed, Bell wrote a check from WGB's bank account to Bay Area for $500,000 as a "partial capital account distribution." Gibbs and Welling did not discover that Bell had signed this check until later, when WGB needed funds to pay for construction of a sewer line at the Park on the Lake property. Gibbs testified that WGB did not have enough cash to make this payment or continue its normal operations. Welling requested that Bay Area return the $500,000 and then, when that was unsuccessful, he made a cash call to raise funds.

At the time of trial in October 2020, the same third party that purchased Lazy Days and Little Thicket had made an offer to purchase the remaining RV park owned by WGB—Park on the Lake—for $4,000,000. WGB's members did not agree on whether to sell that property.

## C. Procedural Background

Bay Area filed a petition seeking declaratory relief and named WGB, Welling, and Gibbs as defendants. Bay Area alleged that WGB sold two properties and realized profits from these sales. In its live pleading at the time of trial, Bay Area alleged that pursuant to section 5.7,[4] WGB was supposed to allocate profits from the sale "first to return the unreturned Capital Contribution of a Member and then pursuant to Section 5.2" Bay Area alleged that, instead of distributing profits from the sales to return Bay Area's capital contribution, WGB "used the profits to reduce unrelated debts of WGB." Bay Area sought a declaration that the profits from the sales should be allocated to reduce the positive balance in its capital account to zero, and the court should order WGB to return Bay Area's $500,000 capital contribution. Bay Area also requested "supplemental relief to the extent necessary to give full

---

[4]   In its original petition, Bay Area alleged that Section 5.2 of the Agreement governed the payment of profits following the sale of the properties and that WGB should have first distributed the profits "to reduce a Member's positive Capital Account balance to zero." Bay Area did not rely on Section 5.7 in its original petition.

8

effect to [its] profit distribution and [its] 25% ownership in the remaining assets of WGB."[5] Bay Area also sought attorney's fees under the Declaratory Judgments Act.

Welling and Gibbs brought a counterclaim seeking declaratory relief. They disagreed that Bay Area was entitled to a preferential return of its capital contribution. They alleged that the unambiguous distribution provisions of the Agreement stated that "Distributable Cash Flow shall be distributed to the Members at such time and in such amounts as a Super Majority Interest shall determine in accordance with the Interest Allocations," which are based on the member's percentage of ownership in the company. Welling and Gibbs sought a declaratory judgment that, pursuant to Section 5.1 and 8.2 of the Agreement, Bay Area was entitled "to distributions of Distributable Cash Flow in an amount equal to its percentage Member interest, or 25%." Welling and Gibbs also asserted additional claims against Bay Area and against third parties.[6]

---

[5] Bay Area amended its petition a second time after trial but before the trial court signed a final judgment. In this amended petition, Bay Area requested that the trial court involuntarily wind up and terminate WGB. Bay Area alleged that WGB's economic purpose was unreasonably frustrated and that it was not reasonably practicable to carry on WGB's business in conformity with its governing documents. Bay Area alleged that WGB had received a written offer to purchase the remaining RV park, and it requested that the court enter an order to accept that offer to purchase the property.

[6] Welling and Gibbs sought injunctive relief against Bay Area and asserted causes of action for civil theft, rescission of Bay Area's membership interest in WGB, and fraud. They also filed third-party claims against Simmons, Bell, Community RV, and Charles S. Simmons in his individual capacity and as trustee for a trust. The trial court severed Bay Area's declaratory judgment claim against WGB, Welling,

9

The trial court held a bench trial on Bay Area's, Welling's, and Gibbs' competing claims for declaratory judgment concerning the interpretation of the Agreement. At trial, Gibbs and Bell testified as the only fact witnesses. Bay Area's counsel also testified concerning attorney's fees. Bay Area had a contingency fee arrangement with its counsel, in which it agreed that "the firm would be conveyed an undivided 40 percent interest in recovery of the capital account, this 500,000-plus figure." Welling and Gibbs' counsel filed a declaration with supporting invoices concerning attorney's fees but their counsel did not present live testimony on this issue.

The trial court signed a final judgment in which it found that Welling and Gibbs failed to satisfy the terms of Section 5.7. The court then concluded that it was equitable and just to award Bay Area its reasonable and necessary attorney's fees under the Declaratory Judgments Act, and the court ordered Welling and Gibbs to pay $204,000 to Bay Area in attorney's fees. The court did not award Bay Area the balance of its capital account.

The trial court also issued findings of fact and conclusions of law. Among other things, the court found that Bay Area's unreturned capital account balance was

---

and Gibbs, and Welling's and Gibbs' declaratory judgment counterclaim against Bay Area from their other claims against Bay Area and all their third-party claims. None of the third-party claims are at issue in this appeal, and none of the third-party defendants are parties to this appeal.

$511,000 at the time WGB sold Lazy Days and Little Thicket. The court also found that Welling and Gibbs "did not first allocate the Profits, as defined by the Company Agreement Art. 1 no. 39, of such sale of the two properties to return the unreturned Capital Contribution, as defined by the Company Agreement Art. 1 no. 11," of Bay Area.

The court made the following conclusions of law:

1.      The Court concludes that Section 5.7 of the Company Agreement is unambiguous.

2.      The Court further concludes that Section 5.7 of the Company Agreement requires that following the sale of property to the independent third party, the profits of such sale shall be allocated first to return the unreturned capital contribution to Plaintiff [Bay Area].

3.      The Court further concludes that Section 5.7 of the Company Agreement does not obligate the "Super Majority Interest" to distribute the "Profits" allocated to the Plaintiff from the sale of the two properties.

4.      The Court further concludes that the Plaintiff is not entitled to a preferential distribution absent a determination by the Super Majority Interest.

5.      The Court further concludes that the Defendants [Welling and Gibbs] failed to satisfy the terms of Section 5.7 of the Company Agreement.

6.      The Court further concludes that it is equitable and just for the Court to award reasonable and necessary attorney's fees to counsel for Plaintiff against Defendants Judston F. Welling and Jonathan D. Gibbs under § 37.009 of the Texas Civil Practice & Remedies Code in the amount of $204,000.00, taxable court costs, and interest.

11

Bay Area, Welling, and Gibbs all filed motions for new trial. These motions were overruled by operation of law, and all parties filed notices of appeal. These appeals followed.

**Interpretation of Company Agreement**

In their first issue, Welling and Gibbs argue that they are entitled to judgment as a matter of law because the Agreement's distribution provisions are unambiguous and only entitle Bay Area to 25% of any distributions that are made. They further argue that Section 5.7 of the Agreement is a tax allocation provision and not a distribution provision. In their second issue, they argue that legally and factually insufficient evidence supports the trial court's finding and conclusion that Welling and Gibbs failed to satisfy Section 5.7.

## A. *Standard of Review*

In a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and on appeal, we review the sufficiency of the evidence supporting those findings by using the same standards for reviewing jury verdicts. *Hall v. Lewis*, 639 S.W.3d 197, 204–05 (Tex. App.—Houston [1st Dist.] 2021, no pet.); *see Tex. Outfitters Ltd., LLC v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019). When challenged, the court's findings of fact are not conclusive if, as here, there is a complete reporter's record on appeal. *Hall*, 639 S.W.3d at 205; *Choice! Power, L.P.*

*v. Feeley*, 501 S.W.3d 199, 208 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)).

When reviewing the legal sufficiency of the evidence, we consider whether the evidence presented at trial would enable reasonable and fair-minded people to reach the verdict under review. *Wood v. Wiggins*, 650 S.W.3d 533, 544 (Tex. App.—Houston [1st Dist.] 2021, pet. denied); *see City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Wood*, 650 S.W.3d at 544. We consider the evidence in the light most favorable to the challenged finding, indulging every reasonable presumption that supports the finding. *Hall*, 639 S.W.3d at 205. We may not disregard evidence that allows only one inference. *Puntarelli v. Peterson*, 405 S.W.3d 131, 135 (Tex. App.—Houston [1st Dist.] 2013, no pet.). If the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the factfinder. *Wood*, 650 S.W.3d at 544. The factfinder is the sole judge of the credibility of the witnesses and the weight to give to their testimony. *Hall*, 639 S.W.3d at 205; *Puntarelli*, 405 S.W.3d at 135.

When we review the factual sufficiency of the evidence, we consider all the evidence supporting and contradicting the finding. *Wood*, 650 S.W.3d at 544; *Puntarelli*, 405 S.W.3d at 135. We will set aside the finding only if it is so contrary

to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Hall*, 639 S.W.3d at 205; *Puntarelli*, 405 S.W.3d at 135.

We review a trial court's conclusions of law de novo. *BMC Software*, 83 S.W.3d at 794; *Wood*, 650 S.W.3d at 544. We will uphold conclusions of law if the judgment can be sustained on any legal theory supported by the evidence. *Wood*, 650 S.W.3d at 544; *Ferrara v. Nutt*, 555 S.W.3d 227, 235–36 (Tex. App.—Houston [1st Dist.] 2018, no pet.). Incorrect conclusions of law do not require reversal if the controlling fact findings support the judgment under a correct legal theory. *Ferrara*, 555 S.W.3d at 236; *see Wood*, 650 S.W.3d at 544 (stating that erroneous conclusion of law does not require reversal if trial court rendered proper judgment).

## B.     *Governing Law*

The company agreement governs the internal affairs of a limited liability company. TEX. BUS. ORGS. CODE § 101.052(a). The company agreement may contain any provision for the regulation and management of the company's affairs that is not inconsistent with law. *Id.* § 101.052(d). When interpreting a company agreement, we apply general principles of contract construction. *See Abdullatif v. Choudhri*, 561 S.W.3d 590, 609–10 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).

When the provisions of a company agreement are unambiguous, we must enforce them as written. *Id.* at 609. We do not question the wisdom of the parties'

14

agreement, and we may not rewrite the agreement's provisions under the guise of interpreting it. *Id.* at 609–10; *see Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003) (stating that courts may neither rewrite parties' contract nor add to its language). Instead, we must determine and enforce the parties' intent as expressed within the four corners of the written agreement. *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 743 (Tex. 2020); *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018). "Objective manifestations of intent control, not 'what one side or the other alleges they intended to say but did not.'" *URI*, 543 S.W.3d at 763–64 (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010)).

We interpret contractual language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise. *Id.* at 764 (quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)). "We examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless." *Gilbert Tex. Constr.*, 327 S.W.3d at 126. We may not interpret a contract to ignore clearly defined terms. *Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 888 & n.15 (Tex. 2021) (per curiam). The interpretation of an unambiguous contract is a question of law that we review de novo. *URI*, 543 S.W.3d at 763.

15

Generally, limited liability companies are pass-through entities that do not pay federal income taxes. *SJ Med. Ctr., L.L.C. v. Estahbanati*, 418 S.W.3d 867, 874 (Tex. App.—Houston [14th Dist.] 2013, no pet.). An LLC with two or more members is classified as a partnership for income tax purposes unless the entity elects to be treated as a corporation. *Hist. Boardwalk Hall, LLC v. Comm'r of Internal Revenue*, 694 F.3d 425, 429 n.1 (3d Cir. 2012); Treas. Reg. § 301.7701–3(a), (b)(1)(i) (as amended in 2020). If the LLC is treated as a partnership for tax purposes, "profits and losses 'pass through' the LLC to its owners, called members, who pay individual income tax on their allocable shares of the tax items." *Hist. Boardwalk Hall*, 694 S.W.3d at 429 n.1; 26 U.S.C. § 701 ("A partnership as such shall not be subject to the income tax imposed by this chapter. Persons carrying on business as partners shall be liable for income tax only in their separate or individual capacities."); *see also* 26 U.S.C. §§ 702–705 (setting out rules for determining taxable income of partnership and partners, distributive shares of partners, and basis of partner's interest in partnership). Generally, the partnership agreement determines a partner's "distributive share of income, gain, loss, deduction, or credit." 26 U.S.C. § 704(a); Treas. Reg. § 1.704-1(a) (as amended in 2020).

Internal Revenue Service regulations provide that "[n]o gain or loss shall be recognized either to the partnership or to any of its partners upon a contribution of property . . . to the partnership in exchange for a partnership interest." Treas. Reg.

§ 1.721-1(a) (as amended in 2011). When a partnership makes a distribution to a partner, the partner shall not recognize any taxable gain as a result "except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution." 26 U.S.C. § 731(a)(1). The initial basis of a partner's partnership interest is the amount of money contributed to the partnership to acquire the interest. *Id.* § 722. The partner's share of the partnership's taxable income, among other things, can increase the partner's basis, and any distributions made to the partner and the partner's share of the partnership's losses decreases the partner's basis. *Id.* §§ 705(a), 733.

IRS regulations set out how a partner's capital account is to be maintained, and the regulations specifically provide that a capital account is increased by (1) the amount of money contributed by the partner to the partnership; (2) the fair market value of property contributed to the partnership; and (3) allocations to the partner of taxable income and gain. Treas. Reg. § 1.704-1(b)(2)(iv)(b). A capital account is decreased by (1) the amount of money distributed to the partner by the partnership; (2) the fair market value of property distributed to the partner by the partnership; (3) allocations to the partner of certain partnership expenditures; and (4) allocations to the partner of partnership losses. *Id.*

Under the Texas Business Organizations Code, a member of an LLC does not have a statutory right to a distribution prior to winding up of the company unless the

company declares a distribution to each member of the company or to a class or group that includes the member. TEX. BUS. ORGS. CODE § 101.204. This provision may, however, be modified by an LLC's company agreement. *See id.* § 101.054(a) (specifying which statutory provisions may not be waived or modified by company agreement).

## C.    *Analysis*

### 1.    **Defined terms in the Agreement and provisions relating to capital accounts**

WGB's members signed the Agreement when Bay Area was admitted as a member in 2017. The Agreement specifically defines 45 terms and states, "The definitions used in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Article 1." The Agreement defines several terms relevant to this dispute as follows:

- "Available Funds" means Company cash on hand, as of the date of computation, including (without limitation) cash derived from any one or more of the following sources: (a) the Capital Contributions of the Members made pursuant to the terms of this Agreement; (b) the proceeds of any Disposition of all or any portion of the assets of the Company, including, but not limited to, any insurance proceeds; and (c) all Company operating income.

- "Capital Account" means with respect to any Member, the account maintained for such Member in a manner which the Manager determines is in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv).

- "Distributable Cash Flow" means any Available Funds not required to meet current or anticipated obligations of the Company, as determined by the Super Majority. In determining what cash is available for

18

distribution, the Super Majority may retain such amounts as the Super Majority in its sole discretion determines will be required to pay the Company's debts, obligations and expenses, to fund a reserve account, to pay the Management Fee and to accomplish the Company's goals and operating results, whether then accrued or anticipated to accrue in the future.

- "Interest Allocation" means with respect to the Members, the allocation of distributions of Distributable Cash Flow or the allocations of Profits, Losses, income, gain, losses, deductions and credits, as the case may be, which is based upon each Member's Interest relative to all of the outstanding Membership Interest held by all of the Members.

- "Profits" and "Losses" means for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with [Internal Revenue] Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments . . . .[7]

- "Super Majority Interest" means Members holding among them at least sixty-six percent (66%) of all of the Membership Interest.

The Agreement does not define the terms "allocate," "distribute," or "property."

Article 3 of the Agreement governs WGB's capital, including capital contributions by the members and the members' capital accounts. Section 3.1 and an attached exhibit require Bay Area to make a capital contribution, upon which it will receive a 25% membership interest in WGB. Section 3.3 provides that "[n]o Member shall have the right to withdraw all or any part of its Capital Contribution" and further provides that if a capital contribution is returned, "[N]o Member shall

---

[7] The definition of "Profits" and "Losses" sets out four ways in which the amount of profits and losses shall be adjusted.

19

have the right to receive property other than cash." Section 3.4(d) states, "Except as otherwise expressly provided for herein, no Member shall have any priority over any other Member as to the return of its contributions to capital . . . ."

Section 3.6 sets out how the members' capital accounts shall be maintained, including providing that a member's capital account shall be increased by (1) the amount of cash and the initial book value of any property contributed as a capital contribution; (2) the member's allocable share of Profits, income, and gain; and (3) the amount of any WGB liabilities that the member expressly assumes. The amount of cash or property distributed to a member and the member's "allocable share of Losses, deductions and other losses" shall decrease the member's capital account. "The Capital Account of each Member shall be determined after giving effect to all transactions that have been effected prior to the time when such determination is made giving rise to the allocation of Profits and Losses and to all contributions and distributions theretofore made."

### 2. The Agreement's distribution and allocation provisions

Article 5 of the Agreement is entitled "Distributions and Allocations" and sets out most of the relevant provisions concerning distributions to WGB's members and allocations of the company's profits and losses to the members.[8]

---

[8] In addition to the provisions set out in Article 5, Section 8.2 addresses distributions and allocations to members upon the winding up and termination of WGB.

Sections 5.1 and 5.3 are distribution provisions contained in Article 5. Section 5.1 provides that "Distributable Cash Flow shall be distributed to the Members at such time and in such amounts as a Super Majority Interest shall determine in accordance with the Interest Allocations." Section 5.3 applies "[n]otwithstanding the foregoing distribution provisions of Section 5.1." Under this provision, WGB members are entitled to receive a cash distribution from the company "in an amount sufficient to enable such Member to discharge its cumulative U.S. federal tax liability (excluding interest and penalties) arising as a result of such Member's interest in the Company." Distributions made under this section are debited against the member's capital account, and they reduce "on a dollar-for-dollar basis the amount of later distributions to such Member pursuant to Section 5.1 or Section 8.2(b)."

Section 5.2 of the Agreement allocates "Profits" and "Losses" to WGB's members. Relevant here, Section 5.2(a)(1) provides that "Profits" are first allocated "to reduce a Member's positive Capital Account balance to zero." The rest of Section 5.2 addresses different allocation rules and provisions, and the section repeatedly references the IRS Treasury Regulations. Section 5.2(f), entitled "Other Allocation Rules," sets out three additional rules and provides that "[t]he following rules will apply to the calculation and allocation of Profits, Losses and other items." The first of these rules, Section 5.2(f)(1), states that "[e]xcept as otherwise provided in this

21

Agreement, all Profits, Losses and other items allocated to the Members will be allocated among them in proportion to their respective Interest Allocations."

Section 5.7, the focus of the parties' arguments at trial and on appeal, is entitled "Allocation Upon Sale of Property." This provision states, "Notwithstanding anything to the contrary in this Agreement, upon the sale of the Property to an independent third party, the Profits of such sale of the Property shall be allocated first to return the unreturned Capital Contribution of a Member and then pursuant to Section 5.2."

After trial, the trial court found that WGB sold two RV parks, but Welling and Gibbs "did not first allocate the Profits . . . of such sale of the two properties to return the unreturned Capital Contribution" of Bay Area. The court concluded that Section 5.7 "requires that following the sale of property to the independent third party, the profits of such sale shall be allocated first to return the unreturned capital contribution to Plaintiff." However, Section 5.7 "does not obligate the 'Super Majority Interest' to distribute the 'Profits' allocated to the Plaintiff from the sale of the two properties." The court concluded that Bay Area was not entitled to a preferential distribution "absent a determination by the Super Majority Interest." The court further concluded that Welling and Gibbs "failed to satisfy the terms of Section 5.7." Although the court did not award damages to Bay Area, it did order Welling and Gibbs to pay $204,000 in attorney's fees to Bay Area.

22

### 3. Whether Section 5.7 is a distribution provision or an allocation provision

The parties disagree about the actions that Section 5.7 requires WGB to take upon the sale of company property. Welling and Gibbs contend that Section 5.7 is a tax allocation provision that addresses tax consequences to a member upon sale of property. They argue that Section 5.7 does not authorize the return of a member's capital contribution in addition to the member's 25% interest in distributions by the company, shared equally by all four members. Bay Area, on the other hand, argues that Section 5.7 is effectively a distribution provision and that, upon the sale of any company property, the section requires the return of a member's unreturned capital contribution.

We begin with the express language of Section 5.7. *See Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 689 (Tex. 2022). Section 5.7 provides that "[n]otwithstanding anything to the contrary in this Agreement, upon the sale of the Property to an independent third party, the Profits of such sale of the Property *shall be allocated first to return the unreturned Capital Contribution of a Member and then pursuant to Section 5.2.*" (Emphasis added.) Unlike Sections 5.1 and 5.3, which specifically refer to "distributions" and amounts that "shall be distributed" to WGB's members, Section 5.7 does not use the word "distribute" or

"distribution."[9] Instead, Section 5.7 provides that "Profits"—a defined term under the Agreement meaning "an amount equal to the Company's taxable income" for a fiscal year—from a sale of WGB property "shall be allocated first" to return a member's unreturned capital contribution and then pursuant to Section 5.2. Section 5.2 is a provision that addresses allocation of profits and losses among WGB's members for federal income tax purposes. Additionally, Section 5.7's language is similar to that of Section 5.2(a)(1), which provides that "Profits for any Fiscal Year will be allocated to the Members as follows: . . . [f]irst, to reduce a Member's positive Capital Account balance to zero."

In the context of partnerships and entities such as LLCs that have elected to be taxed as partnerships, "allocation" and "distribution" are distinct concepts.[10] *See,*

---

[9] Section 8.2, which addresses liquidation upon the winding up of WGB, uses similar language as Sections 5.1 and 5.3 to refer to funds that WGB transfers to the members. For example, Section 8.2 provides that WGB's liquidator shall pay all company debts and liabilities and then sell all company properties and assets for cash. "All Net Profit and Net Loss realized on such sales shall be allocated to the Members as provided in this Agreement, and the Capital Accounts of the Members shall be adjusted accordingly." Then, the liquidator shall "distribute the proceeds of such sales . . . to the Members in the manner provided in Section 5.1." If the distributions do not equal the member's positive capital account balance, then the liquidator must adjust the allocations of Net Profit and Net Loss "to produce a Capital Account balance for each Member which corresponds to the amount of the distribution to such Member."

[10] *See also* 20 Elizabeth S. Miller & Robert A. Ragazzo, *Texas Practice: Business Organizations* § 20:9 n.2 (3d ed. 2021) ("Allocation of profits and losses should be distinguished from the matter of distributions, a related but distinct issue . . . . Allocation of profits and losses and distributions of cash and property should be separately addressed in the company agreement but should be coordinated

24

*e.g.*, Treas. Reg. § 1.704-1(b)(2)(iv)(b) (providing that amount of money contributed to partnership and allocations to partner of partnership income and gain increase partner's capital account, while amount of money distributed to partnership by partnership and allocations to partner of partnership loss decrease partner's capital account). "Allocation" refers to how profits and losses are divided among the company's members, typically for tax purposes. *See* TEX. BUS. ORGS. CODE § 101.201 ("The profits and losses of a limited liability company shall be allocated to each member of the company on the basis of the agreed value of the contributions made by each member, as stated in the company's records . . . .").

"Distribution" refers to the member's receipt of money or property from the company, either in accordance with the company agreement or upon winding up of the company. *See, e.g.*, *id.* §§ 101.202 (providing that member is entitled to receive or demand distribution from company only in form of cash), 101.203 ("Distributions of cash and other assets of a limited liability company shall be made to each member of the company according to the agreed value of the member's contribution to the company as stated in the company's records . . . ."), 101.204 (stating default rule that member is not entitled to interim distribution before winding up of company unless

---

to effectuate the 'deal' the parties have made. The allocation provisions determine how income and loss of the LLC are allocated among the members for book and tax purposes, while the distribution provisions determine when and in what proportions cash or property is actually distributed among the members.").

company declares distribution to all members or to class or group that includes member); *cf. In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 466 (Tex. 2011) (orig. proceeding) (noting that allocation of partnership income or profits to partner "does not convert the amounts allocated into property of or income to the partner").

When construing a company agreement, we must determine and enforce the parties' intent as expressed within the four corners of the agreement. *Piranha Partners*, 596 S.W.3d at 743. We may not rewrite or add to the parties' agreement. *Schaefer*, 124 S.W.3d at 162. Because Section 5.7 does not refer to distributions but instead refers to an allocation of profits and to another provision of the agreement that addresses allocation of profits for tax purposes, we agree with Welling and Gibbs that Section 5.7 is an allocation provision and not a distribution provision. We disagree with Bay Area that upon the sale of WGB property, Section 5.7 requires a preferential distribution to Bay Area returning its capital contribution. Instead, the distribution provision in Section 5.1 requires that, when the holders of a super majority interest determine that a distribution of "Distributable Cash Flow" shall be made to the members, each member receives a distribution based on the "Member's Interest relative to all of the outstanding Membership Interest held by all of the Members," or an equal 25% share.[11]

---

[11]     Similarly, Section 8.2 requires WGB's liquidator, upon sale of the company's properties and assets following winding up, to allocate all net profits and net losses to the members, adjust the members' capital accounts, and then "distribute the

26

Bay Area emphasizes the opening clause of Section 5.7, "[n]otwithstanding anything to the contrary in this Agreement," and argues that this clause mandates that Section 5.7 be given effect even if other provisions in the Agreement contradict this section. *See, e.g.*, *Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635, 643 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("When parties use the clause 'notwithstanding anything to the contrary contained herein' in a paragraph of their contract, they contemplate the possibility that other parts of their contract may conflict with that paragraph, and they agree that this paragraph must be given effect regardless of any contrary provisions of the contract."). As Welling and Gibbs point out, however, "[s]uperordinating language (signaled by notwithstanding or despite) merely shows which provision prevails in the event of a clash but does not necessarily denote a clash of provisions." *See Horseshoe Bay Resort, Ltd. v. CRVI CDP Portfolio, LLC*, 415 S.W.3d 370, 384 (Tex. App.—Eastland 2013, no pet.).

Section 5.7, as a tax allocation provision, does not conflict with Sections 5.1 or 8.2, the distribution provisions. Instead, these sections address different issues: Section 5.7 addresses the allocation of profits after company property is sold, and Sections 5.1 and 8.2 address distributions to WGB's members, whether during the

---

proceeds of such sales or such properties to the Members in the manner provided in Section 5.1."

life of the company (governed by Section 5.1) or upon winding up and termination of the company (governed by Section 8.2). We conclude that Section 5.7 does not conflict with Sections 5.1 and 8.2. Thus, the trial court was not required to give effect to Section 5.7 over Sections 5.1 and 8.2.

We further hold that Welling and Gibbs established as a matter of law that Section 5.1 of the Agreement governs distributions of "Distributable Cash Flow" made during the existence of WGB. Under that section, when a "Super Majority Interest" decides to make distributions, Bay Area is entitled to a distribution "in accordance with the Interest Allocations." Bay Area's "Interest Allocation"—its "Interest relative to all of the outstanding Membership Interest held by all of the Members"—is 25%. We therefore render judgment that Bay Area is entitled to 25% of all distributions made by WGB.

We sustain Welling and Gibbs' first issue.

### 4. Whether Welling and Gibbs failed to satisfy Section 5.7

The trial court found that WGB sold two of its three properties to an independent third party. It also found that Welling and Gibbs "did not first allocate the Profits . . . of such sale of the two properties to return the unreturned Capital Contribution" to Bay Area. Similarly, the trial court concluded that Welling and Gibbs failed to satisfy the terms of Section 5.7. The court, however, also concluded that Section 5.7 does not obligate the super majority interest to distribute the profits

28

allocated under Section 5.7 to Bay Area. It further concluded that, absent a determination by the Super Majority Interest, Bay Area was not entitled to a preferential distribution returning its capital contribution.

At trial, Gibbs testified concerning the sale of the Lazy Days and Little Thicket RV parks. In 2019, all members of WGB agreed to sell these two properties to a third party. Gibbs testified that the purchase price for the properties was $2,750,000, and WGB received approximately $2,500,000 in net proceeds from these sales. Gibbs also testified that Moody National Bank held a lien on all three of WGB's properties, and at the time of the sale of Lazy Days and Little Thicket, the outstanding balance on the loan was $4,000,000. Gibbs stated that all members of WGB agreed to apply the sales proceeds to reduce the loan balance with Moody National Bank to $1,500,000. The trial court did not admit any documentary evidence reflecting this agreement, but Gibbs' testimony on this matter was uncontroverted. Gibbs agreed that no portion of the sales proceeds was used to return Bay Area's capital contribution. Instead, the proceeds were used to pay down the balance of the loan with Moody National Bank. Furthermore, after the sales closed, Bell wrote a $500,000 check to Bay Area without Welling's or Gibbs' knowledge.

Bell acted as the "operational manager" for Bay Area for several years. In March 2018, Gibbs, Welling, and Bay Area all agreed to remove Bell as a manager, and WGB hired a professional management company to manage WGB's properties.

Gibbs also testified that Simmons, Bay Area's principal, was responsible for filing WGB's tax return for the 2019 tax year,[12] which would have reflected the sale of the two properties. Gibbs and Welling received the 2019 tax return and their Schedule K-1s approximately one week before trial in October 2020. No party offered the 2019 tax return into evidence. As a result, no documentary evidence reflects how WGB's profits and losses for the 2019 tax year were allocated to the members.

In arguing that the trial court erred by finding and concluding that they failed to comply with Section 5.7, Welling and Gibbs emphasize that Simmons, on Bay Area's behalf, was the person in charge of completing and filing the 2019 tax return. They also focus on the uncontroverted testimony that the parties agreed that the proceeds from the sales of the properties would be used to pay down the loan with Moody National Bank, rather than distributing cash to the members. In response, Bay Area argues that the trial court's finding and conclusion are supported by sufficient evidence because it is undisputed that none of the profits realized from the sale of the properties were used to return Bay Area's capital contribution, and any applicability of the distribution provisions in Sections 5.1 and 8.2 are negated by

---

[12]    In September 2020, Welling, Gibbs, and Bay Area agreed in writing that Simmons would be WGB's "Partnership Representative for the Company's 2019 tax return." This document was attached as an exhibit to Welling and Gibbs' motion for new trial, but it was not offered or admitted into evidence at the bench trial. Prior to Bell's removal as "operating manager," he worked with WGB's accountant to prepare the tax returns and the Schedule K-1s for each member.

Section 5.7, which applies "notwithstanding anything to the contrary in this Agreement."

Because Section 5.7 is a tax allocation provision, and not a distribution provision, it matters how the profits from the sale of the properties were allocated among the members. However, no evidence concerning this was presented at trial. Gibbs agreed that Simmons was "the member in WGB who directed the CPA to file the tax return" for the 2019 tax year, which would have reflected any profits WGB received from the sale of the properties in early 2019. WGB's 2019 tax return was not admitted into evidence, nor was any other documentary evidence admitted demonstrating how profits from the sale were allocated. Bay Area presented no evidence that either Welling or Gibbs was responsible for accounting decisions or determining the allocation of profits.[13]

Moreover, Bay Area does not address the effect of the parties' agreement that the proceeds from the sale of the properties would be used to reduce the balance of the loan held by Moody National Bank. Gibbs testified that all members of WGB

---

[13] At the temporary injunction hearing, Gibbs testified that he did not believe that Bay Area was entitled to a preferential distribution upon sale of the properties, and he did not "agree or authorize for any of the companies' money to be distributed to Mr. Simmons." However, as we have discussed, there is a distinction between a distribution and an allocation of profits. Gibbs' objection to the distribution of funds to Bay Area by WGB following the sale of the properties does not necessarily mean that Gibbs also objected to profits from the sale of the properties being allocated first to Bay Area.

agreed that, upon the sale of the properties, the proceeds would be used to reduce the loan balance and would not be used to make distributions to any members. Bay Area did not provide any contradictory testimony or evidence. Simmons did not testify at trial, and although Bell did testify, he did not testify concerning the sale of the properties in 2019.

Under section 5.7, after the sale of the properties, Bay Area was entitled to an allocation of profits from the sale to return its unreturned capital contribution. However, the unrebutted evidence reflects that Bay Area, along with the other three members of WGB, agreed to apply the proceeds from the sale to reduce the balance of the loan with Moody National Bank. This agreement, which is separate from the company agreement itself, effectively suspended the application of Section 5.7 with respect to these sales.[14]

Considering the evidence in the light most favorable to the trial court's findings, we conclude that no evidence supports the finding that Welling and Gibbs "did not first allocate the Profits, as defined by the Company Agreement Art. 1 no. 39, of such sale of the two properties to return the unreturned Capital Contribution,

---

[14]    We note that Section 11.7 of the Agreement allows amendments to the Agreement by action of the "Super Majority." Certain amendments affecting a member "shall require the consent of the Member affected thereby." These amendments include any amendment or modification to the Agreement that "materially alter[s]" a member's "share of allocations of Profits (or any item thereof) and Losses (or any item thereof) or distribution."

as defined by the Company Agreement Art. 1 no. 11, of [Bay Area]." We further conclude that the trial court erred in concluding that Welling and Gibbs "failed to satisfy the terms of Section 5.7 of the Company Agreement."

We sustain Welling and Gibbs' second issue.

### Attorney's Fees

In their third issue, Welling and Gibbs argue that the trial court erred in awarding $204,000 in attorney's fees to Bay Area. They argue that this award was improper because (1) aside from the trial court's conclusion that Welling and Gibbs violated Section 5.7, Bay Area did not prevail on any other substantive issue in the case and was not awarded damages, and therefore the trial court abused its discretion in awarding attorney's fees under the Declaratory Judgments Act; and (2) Bay Area did not present legally and factually sufficient evidence to support the amount of attorney's fees awarded as reasonable and necessary. In their fourth issue, Welling and Gibbs argue that the trial court should have awarded them their attorney's fees.

### A. *Governing Law*

Generally, in Texas, each party must pay its own attorney's fees. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 483 (Tex. 2019); *Ashford Partners, Ltd. v. ECO Res., Inc.*, 401 S.W.3d 35, 41 (Tex. 2012) ("As a general rule, litigants in Texas are responsible for their own attorney's fees and expenses in litigation."). However, fee-shifting can be authorized by statute or contract.

33

*Rohrmoos Venture*, 578 S.W.3d at 484; *JCB, Inc. v. Horsburgh & Scott Co.*, 597 S.W.3d 481, 491 (Tex. 2019). The party seeking a fee award must prove that (1) the recovery of fees is legally authorized, and (2) the requested fees are reasonable and necessary. *Rohrmoos Venture*, 578 S.W.3d at 483; *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 809 (Tex. 2017) ("When fee-shifting is authorized, the party seeking to recover those fees bears the burden of establishing the fees are reasonable and necessary.").

The Declaratory Judgments Act authorizes recovery of attorney's fees and provides that, "[i]n any proceeding under [the Act], the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE § 37.009. The "reasonable and necessary" requirements under the Declaratory Judgments Act are questions of fact for the fact-finder, while the "equitable and just" requirements are questions of law for the trial court. *GuideOne Elite Ins. Co. v. Fielder Road Baptist Church*, 197 S.W.3d 305, 311 (Tex. 2006). The Declaratory Judgments Act authorizes an award of equitable and just attorney's fees in any proceeding under the Act. *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 355 (Tex. 2020).

We review a trial court's decision to award or not award attorney's fees under the Declaratory Judgments Act for an abuse of discretion. *See Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 161 (Tex. 2004). In a declaratory judgment action, we

"broadly construe" the trial court's discretion to award attorney's fees. *Vincent v. Bank of Am., N.A.*, 109 S.W.3d 856, 868 (Tex. App.—Dallas 2003, pet. denied).

## B.      Analysis

In its final judgment, the trial court awarded $204,000 in attorney's fees to Bay Area under the Declaratory Judgments Act. In its findings of fact and conclusions of law, the court concluded that it was "equitable and just for the Court to award reasonable and necessary attorney's fees" to Bay Area. Welling and Gibbs argue that the award of attorney's fees was inappropriate under the Declaratory Judgments Act because Bay Area only prevailed on the question whether Welling and Gibbs satisfied the terms of Section 5.7, and it did not prevail on any other substantive issue or secure an award of damages. Instead, Welling and Gibbs prevailed at trial on whether Bay Area was entitled to a preferential distribution of its capital contribution.

The Declaratory Judgments Act does not include language limiting an award of attorney's fees to a "prevailing party." *See Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 637 (Tex. 1996) ("[T]he award of attorney's fees in declaratory judgment actions is clearly within the trial court's discretion and is not dependent on a finding that a party 'substantially prevailed.'"). The trial court has discretion to decline to award attorney's fees to either party. *Approach Res. I, L.P. v. Clayton*, 360 S.W.3d 632, 639 (Tex. App.—El Paso 2012,

no pet.). It is also not, in itself, an abuse of discretion to award attorney's fees to a nonprevailing party. *Vincent*, 109 S.W.3d at 868; *see also Severs v. Mira Vista Homeowners Ass'n*, 559 S.W.3d 684, 712 (Tex. App.—Fort Worth 2018, pet. denied) ("Indeed, under section 37.009, a trial court has discretion to even award attorney's fees to a nonprevailing party.").

As this Court has stated, "One need not even be the prevailing party or seek affirmative relief to be awarded attorney's fees under the [Declaratory Judgments Act], as long as the award of fees is equitable and just." *Hong Kong Dev., Inc. v. Nguyen*, 229 S.W.3d 415, 452 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *see Lederer v. Lederer*, 561 S.W.3d 683, 700 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("[A]ttorney's fees may be awarded under [the Declaratory Judgments] Act to a party who presented no claims, and even where the declaratory judgment sought concerns a question of law on which no jury finding is necessary.") (quoting *U.S. Fid. & Guar. Co. v. Coastal Refin. & Mktg., Inc.*, 369 S.W.3d 559, 571 (Tex. App.—Houston [14th Dist.] 2012, no pet.)).

We have agreed with Welling and Gibbs that the trial court erred in finding and concluding that they did not satisfy the terms of Section 5.7 of the Agreement. This was the only finding and conclusion in Bay Area's favor; the trial court did not award monetary damages to Bay Area.

36

Although the Declaratory Judgments Act does not limit the award of attorney's fees to a prevailing party, when a declaratory judgment is reversed on appeal, the award of attorney fees may no longer be equitable and just. *Trinity Drywall Sys., LLC v. Toka Gen. Contractors, Ltd.*, 416 S.W.3d 201, 215 (Tex. App.—El Paso 2013, pet. denied); *Boerschig v. Sw. Holdings, Inc.*, 322 S.W.3d 752, 768 (Tex. App.—El Paso 2010, no pet.). The trial court has "sound discretion" to award attorney's fees under the Declaratory Judgments Act, but the court's "exercise of that discretion should be based on the facts and circumstances of each case." *Trinity Drywall Sys.*, 416 S.W.3d at 215. Thus, in this situation, we may reverse the award of attorney's fees and remand the case to the trial court to allow it to reconsider the fee award. *See Edwards Aquifer Auth. v. Chem. Lime, Ltd.*, 291 S.W.3d 392, 405 (Tex. 2009); *Trinity Drywall Sys.*, 416 S.W.3d at 215; *Boerschig*, 322 S.W.3d at 768–69.

In their fourth issue, Welling and Gibbs argue that they received findings and conclusions in their favor and they are entitled to their attorney's fees under the Declaratory Judgments Act. They argue that they submitted to the trial court evidence that they incurred $82,825 in attorney's fees, and Bay Area did not controvert that amount or argue that this amount was not reasonable and necessary. They therefore request that we render judgment awarding them $82,825 in attorney's fees.

Uncontroverted testimony by an interested witness may establish as a matter of law that the attorney's fees sought are reasonable and necessary. *Rosenblatt v. Freedom Life Ins. Co. of Am.*, 240 S.W.3d 315, 321 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 210 (Tex. App.—Austin 2005, pet. denied). However, this is subject to specific conditions. *Rosenblatt*, 240 S.W.3d at 321.

> Testimony by an interested witness establishes a fact as a matter of law if: (1) the testimony could be readily contradicted if untrue; (2) it is clear, direct, and positive; and (3) there are no circumstances tending to discredit or impeach it. Where trial counsel's testimony concerning attorney's fees is clear, positive and direct, and uncontroverted, it is taken as true as a matter of law, especially true when the opposing party had the means and opportunity to disprove the testimony and failed to do so.

*McMillin*, 180 S.W.3d at 210 (internal citations omitted); *see Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990) (per curiam); *Rosenblatt*, 240 S.W.3d at 321.

In some situations, such as when a prevailing party seeks attorney's fees under Civil Practice and Remedies Code Chapter 38, an award of fees is mandatory if the party has presented proof of the reasonableness of the fees. *Recognition Commc'ns, Inc. v. Am. Auto. Ass'n, Inc.*, 154 S.W.3d 878, 891 (Tex. App.—Dallas 2005, pet. denied); *McMillin*, 180 S.W.3d at 210 (stating, in case involving attorney's fees under Chapter 38, that "a jury cannot simply refuse to award attorney's fees if any were properly proven"). However, as stated above, the Declaratory Judgments Act

does not mandate an award of attorney's fees. Instead, the trial court "may" award reasonable and necessary attorney's fees "as are equitable and just." TEX. CIV. PRAC. & REM. CODE § 37.009; *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998) ("Unreasonable fees cannot be awarded, even if the court believed them just, but the court may conclude that it is not equitable or just to award even reasonable and necessary fees."). The court may award attorney's fees to the prevailing party, to the nonprevailing party, or to neither party. *See Severs*, 559 S.W.3d at 712; *Approach Res. I*, 360 S.W.3d at 639; *see also Feldman v. KPMG LLP*, 438 S.W.3d 678, 685 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (stating that trial court has "broad discretion" under Declaratory Judgments Act to afford all parties opportunity to request fees, decline to award fees, and allow fee award "only when reasonable, necessary, equitable, and just").

An award of attorney's fees under the Declaratory Judgments Act is a matter within the trial court's broad discretion. *See Feldman*, 438 S.W.3d at 685. We decline to render judgment awarding Welling and Gibbs attorney's fees as a matter of law. However, because we hold that the trial court erred by finding and concluding that Welling and Gibbs failed to satisfy Section 5.7 of the Agreement, we vacate the award of $204,000 in attorney's fees to Bay Area. We remand the case for the trial court to reconsider, in light of our opinion, whether to award attorney's fees. *See Trinity Drywall Sys.*, 416 S.W.3d at 215; *see also Edwards Aquifer Auth.*, 291

S.W.3d at 405 ("Now that Chemical Lime is no longer the prevailing party, the trial court should have the opportunity to reconsider its [attorney's fees] award."); *SAVA gumarska in kemijska industria d.d. v. Advanced Polymer Scis., Inc.*, 128 S.W.3d 304, 324 (Tex. App.—Dallas 2004, no pet.) (remanding issue of whether to award attorney's fees under Declaratory Judgments Act, "to whom any such fees may be awarded," and "the reasonable and necessary amount of any such attorneys' fees if awarded").

Although we overrule Welling and Gibbs' fourth issue, we sustain their third issue in part.[15]

---

[15] Welling and Gibbs also argue, in their third issue, that the trial court's award of $204,000 in attorney's fees to Bay Area was not supported by legally and factually sufficient evidence. Because we vacate the award of attorney's fees and remand that issue to the trial court for reconsideration in light of this opinion, we need not address this portion of Welling and Gibbs' third issue. *See* TEX. R. APP. P. 47.1 (stating that court of appeals must hand down opinion that "addresses every issue raised and necessary to final disposition of the appeal").

## Conclusion

We reverse the trial court's declaration that Welling and Gibbs failed to satisfy the terms of Section 5.7 of the Company Agreement. We render judgment that Bay Area is entitled to 25% of any distributions made by WGB. We vacate the award of $204,000 in attorney's fees to Bay Area, and we remand the case to the trial court to reconsider its award of attorney's fees in light of this opinion.

April L. Farris
Justice

Panel consists of Justices Landau, Guerra, and Farris.